

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

EAG:RTP
F.#2011R01454

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

June 25, 2012

**BY ECF and HAND DELIVERY**

The Honorable Brian M. Cogan
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:   United States v. Richard Ortiz
              Criminal Docket No. 11-645 (BMC)

Dear Judge Cogan:

      The defendant Richard Ortiz has pled guilty to escape from custody, in violation of 18 U.S.C. § 751(a), and is awaiting sentencing. As the Court is aware, the defendant has challenged various aspects of the Presentence Investigation Report ("PSR") prepared in this case. The government respectfully submits letter to supplement its initial sentencing submission dated May 17, 2012 (Docket Entry No. 14) responding to the defendant's objections.

I.    Background

      As detailed in the PSR, on October 30, 2007, the defendant was sentenced in the District of New Jersey by the Honorable Katharine S. Hayden to 62 months' imprisonment and three years of supervised release after pleading guilty to being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). On July 31, 2011, the defendant was transferred to the Brooklyn Residential Reentry Center ("BRRC") to serve the final months of his custodial sentence, which, given his accrual of "good time" credit, was set to end on October 26, 2011.

      On August 11, 2011, the defendant submitted a urine sample that laboratory testing revealed was a "substituted," i.e., non-human, sample. BRRC staff and Bureau of Prison officials determined that as a result of the defendant's infraction, he was to be remanded to a secure BOP facility. On August 19, 2011, two deputy United States Marshals arrived at the BRRC to bring the defendant to the Metropolitan Detention Center

("MDC"). The defendant was brought into a first-floor waiting room by BRRC staff where the deputy marshals were waiting. When the defendant was told that the deputies were there to transport him to the MDC, he pushed two BRRC staff members out of his way and ran out of the room. Intent on escaping, he ran up to the second floor of the facility, jumped out of a window, and scaled a fence that was topped in razor-wire, cutting his hand in the process.

The deputy marshals pursued and eventually saw him walking on a nearby sidewalk. When the defendant saw the deputies, he ran into a metal fabrication factory. The marshals followed the defendant into the factory and instructed him to stop. One of the marshals eventually located the defendant in a room where the only way out for the defendant was the entrance that the marshal was blocking. The defendant then attempted to grab a large pipe that was hanging from a rack and disregarded the deputy's command to stop. At that point, the deputy used his Taser gun to subdue the defendant. The Taser projectile hit the defendant in the arm subduing him.

II. The Defendant Used and Threatened to Use Force During His Escape

The defendant contends that he should not receive a five-level enhancement pursuant to United States Sentencing Guideline § 2P1.1(b)(1) because he did not use or threaten force during his escape. As the government noted in its initial sentencing submission, the government will call two witnesses at the defendant's sentencing hearing: Robyn Causey, the BRRC's Facility Administrator, and Deputy United States Marshal Thomas Jack. The government expects that Ms. Causey will testify that the defendant pushed her and another BRRC staff member as he fled the BRRC's first-floor waiting room. The government expects that Deputy Marshal Jack will testify that he pursued the defendant through the steel fabrication factory and that the defendant, while cornered in a room inside the factory, reached for a hanging pipe, did not comply with instructions to stop, and that Deputy Marshal Jack, fearing for his safety, used his Taser to subdue the defendant.

The defendant argues that even if the Court concludes that he used or threatened force, he should still not receive the five-offense level enhancement pursuant to § 2P1.1(b)(1) because "there is no evidence that he intentionally used or threatened force, and intent seems to be required before imposing the enhancement." (Letter of Michael Schneider, Esq., to the Court, dated April 16, 2012 ("Def.'s Ltr.") (Docket Entry No. 12)). The

2

Court should reject this argument. The defendant does not dispute that he intended to escape from the BRRC and evade the marshals, including by jumping out of a second floor window and refusing commands to stop. As such, there is a preponderance of evidence that the defendant also intended to use and threaten force when he pushed the BRRC staff members out of his way and reached for a pipe during his escape. It is well accepted that a defendant is presumed to intend the natural consequences of his acts.

Moreover, the defendant offers no support for his position that a showing of <u>intentional</u> use or threat of force is required before the five-level enhancement is imposed. Nor can he. The plain language of 2P1.1(b)(1) clearly provides for a sentencing enhancement where, as here, "the use or the threat of force against any person was involved." <u>See</u> <u>United States v. Mingo</u>, 340 F.3d 112, 114 (2d Cir. 2003) ("Where, as here, the language of the Guidelines provision is plain, the plain language controls.") (citations omitted)). Accordingly, the government submits that the five-level enhancement pursuant to § 2P1.1(b)(1) is warranted.

III. <u>The Defendant Submitted a Non-Human Urine Sample</u>

The defendant, who has an extensive history of drug abuse, including abusing marijuana, cocaine and crack cocaine, <u>see</u> Def's Ltr. at 1; PSR ¶¶ 22-23, 45, 55, denies submitting a substituted urine sample on August 11, 2011. Def.'s Ltr. at 2. In support, the defendant offers his "suspicion" that it was the "nutritional supplements he was ingesting [that] gave rise to the laboratory report which preceded his escape," <u>id.</u>, and suggests that the results of the lab report are inconsistent with the urine samples that he provided shortly before and after he submitted the August 11, 2011 substituted sample, each of which were negative for the presence of narcotics.

As set forth below, a preponderance of evidence supports a finding that the defendant submitted a substituted urine sample. A copy of the laboratory report documenting the laboratory's conclusion that the urine sample the defendant provided was substituted is attached hereto as Exhibit 1. A chain of custody form that was signed by the defendant to indicate that the August 11, 2011 sample had been placed in a specimen container that was "sealed with tamper-proof seal(s) in his presence" is attached hereto as Exhibit 2. Further, the government has conferred with Dr. Neil Dash, the Chief Medical Review Officer of the laboratory that tested the defendant's urine sample. Dr. Dash advised the government that the

3

defendant's urine sample was deemed a substituted sample because the amount of creatinine, a substance naturally found in human muscle, in the sample fell below a specified threshold level. Dr. Dash further advised that <u>all</u> human urine contains creatinine and that if a urine sample does not contain creatinine or contains an amount below a threshold level, as it did here, the urine is deemed substituted, <u>i.e.</u>, not belonging to a living human.  Dr. Dash further advised that creatine, the nutritional supplement that the defendant claims he was taking and that he suspects caused his urine sample to be deemed substituted, would not cause the low levels of creatinine found in the defendant's sample. Finally, Dr. Dash advised that the fact that the defendant submitted legitimate urine sample that came back negative for narcotics shortly before and after he submitted the substitute urine sample does not mean that he did not submit a substituted sample on August 11.  Accordingly, the government maintains that the defendant submitted a substituted urine sample on August 11, 2011.

IV. <u>The Defendant's 2004 Conviction for Resisting Arrest</u>

The defendant denies that he threw a chair at his ex-girlfriend during an altercation in 2004.  He also denies pushing a police officer and running from officers who went to arrest him for violating the terms of a temporary restraining order that the girlfriend filed against him when he was found in the vicinity of his girlfriend's apartment.  <u>See</u> PSR ¶ 27.  His denials are without met.

The defendant pled guilty on August 9, 2004, in the Superior Court of New Jersey, Hudson County, to resisting arrest.[1]  Police reports obtained from the Jersey City Police Department, which are attached hereto as Exhibit 3, indicate that the defendant's girlfriend obtained a restraining order against him after he threw a chair at her that hit her in the arm. Shortly thereafter, the girlfriend called police because she saw the defendant in the vicinity of her apartment.  When officers arrived and confronted the defendant, the defendant pushed one of the officers out of the way and fled.  The defendant led the officers through several backyards and alleys, refusing their orders to stop.  The officers were forced to use pepper spray to

---

[1] The defendant was initially charged with Aggravated Assault of his girlfriend and with multiple counts of Aggravated Assault of a Police Officer.  <u>See</u> PSR ¶ 27.

4

subdue the defendant who continued to resist arrest even after being handcuffed.[2]

  The defendant does not dispute that his girlfriend filed a temporary restraining order against him.  He denies, however, hitting her, pushing the officer, and resisting arrest.  Def's Ltr. at 2.  Notwithstanding the defendant's bare denials, the government submits that the police reports sufficiently detail the defendant's conduct underlying this offense and are indeed consistent with the defendant's evasive conduct when arrested by the NYPD in 1996, see PSR ¶ 22 and State of New York Division of Parole, Violation of Release Report, at 2, attached hereto as Exhibit 4,[3] and when confronted by the marshals in this case.

V. The Defendant's 2007 Conviction for Being a Felon in Possession of a Firearm

  The defendant argues that the PSR omits the "critical fact" that the firearm he was convicted of possessing as a previously convicted felon was unloaded and inoperable.  The defendant's focus on the inoperability of the firearm and whether it was loaded underscores his continued failure to accept responsibility for his actions.  The government submits that the "critical fact" is not that the firearm was inoperable, but, as the defendant admitted in his plea agreement with the United States Attorney's Office for the District of New Jersey, he "knowingly pointed [the] firearm at and in the direction of another person under circumstances manifesting extreme indifference to the value of life, thereby committing an aggravated assault, contrary to N.J.S.A. § 2C:12-1b(4)."  See Plea Agreement with Richard Ortiz, United States v. Richard Ortiz, 2:06-CR-858 (KSH) (D. N.J.) at pg.6, ¶ 1(e), attached hereto as Exhibit 5.  As a result of the defendant's actions, the arresting officer, who was notified that the defendant had a firearm, drew his weapon when he arrived at the scene, and in a

---

[2] The defendant was brought to a local hospital after his arrest after he complained of shortness of breath.

[3] Also relevant to the Court is the fact that the defendant used an alias in connection with his arrest and conviction for the attempted sale of a controlled substance for which he received an indeterminate sentence of 18 to 54 months.  See PSR ¶ 22.

5

matter of minutes, several people were placed in risk of serious harm.[4]

VI. The Defendant Did Not Lose Any Good Time Credit For His Escape

The defendant objects to paragraph 33 of the PSR which indicates that he lost 180 days of good time credit for his submission of a substituted urine sample. He claims that he lost good time credit not for his submission of the substituted urine sample but for his escape. He is wrong.

BOP records, attached hereto as Exhibits 6 and 7, indicate that the defendant received an administrative hearing regarding his substituted urine sample at which he was offered the opportunity to call witnesses on his behalf and have a representative with him at the hearing. He declined both offers. The hearing officer concluded that the defendant submitted a substitute urine sample and recommended that the defendant lose all of his available good time credit and be remanded to a more secure facility. The BOP did not charge the defendant with escape and did not take away any good time credit from him because of it.[5]

VII. The Defendant Has Not Accepted Responsibility

The government respectfully submits that based on the defendant's sentencing submission, the defendant has not accepted responsibility for his actions and therefore should not receive the two-level reduction for acceptance of responsibility pursuant to § 3E1.1(a).

The defendant bears the burden of establishing that he is entitled to receiving the acceptance of responsibility reduction. See United States v. Shahid, 390 Fed Appx. 24, at *1

---

[4] The defendant again used an alias when he was confronted by law enforcement. He also claimed to officers that he found the gun in an empty lot while on his cigarette break. See PSR ¶ 28.

[5] The defendant lost 20 days good time credit, 160 days of non-vested good time credit, ("NVGCT"), one year of visiting privileges ("LP Visit") and one year of visiting privileges with individuals other than his immediate family "LP Visitrs") (to follow the one year of general visiting privileges). See Exhibit 7.

6

(2d Cir. Aug. 13, 2010) (citing <u>United States v. Smith</u>, 174 F.3d 52, 55-56 (2d Cir. 1999)). In determining whether a defendant should receive the two-level reduction, the Court should consider whether the defendant has truthfully admitted the conduct comprising the offense and truthfully admitted or not falsely denied any additional relevant conduct for which he is accountable. "While a defendant may remain silent in respect to relevant conduct beyond the offense of conviction without affecting his ability to obtain a reduction . . . . [a] defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility." <u>See</u> Application Note 1(A) to United States Sentencing Guideline § 3E1.1(a). Here, the defendant's denial that he submitted a substituted urine sample, his denial that he pushed two BRRC staff members out of his way, his denial that he threatened the deputy marshal with a pipe, and his denial of the facts underlying his previous convictions, taken together, demonstrate that he has not accepted responsibility for his actions and the Court should therefore not grant him the two-level reduction pursuant to § 3E1.1(a).

Accordingly, the government submits that the defendant's advisory Guidelines calculation is as follows:

| | |
|---|---|
| Base Offense Level (§2P1.1(a)) | 13 |
| Plus: Use or threat of force against any person (§2P1.1(b)(1)) | +5 |
| Less: Escape from non-secure custody (§2P1.1(b)(3)) | -4 |
| Total: | <u>14</u> |

Thus, the government submits that the total offense level is level 14, which, based on a criminal history category of VI, carries a range of imprisonment of 37 to 46 months. For the reasons set forth above and in the government's initial sentencing submission, the government submits that a sentence

within this range is sufficient but not greater than necessary to comply with the objectives of 18 U.S.C. § 3553(a).

>     Respectfully submitted,
>
>     LORETTA E. LYNCH
>     UNITED STATES ATTORNEY
>
> By: /s/ Robert T. Polemeni
>     Robert T. Polemeni
>     Assistant U.S. Attorney

cc: Clerk of the Court (BMC) (by ECF)
    Michael Schneider, Esq. (by ECF)
    Mary Ann Betts, United States Probation Officer (by email)